UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SOETEN, | Case No.: 3:24-cv-00043-JAH-BLM |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| CACI, INC. – FEDERAL, a Delaware corporation; and DOES 1 through 20, | |
| Defendants. | **[ECF No. 32]** |

## <u>INTRODUCTION</u>

Pending before the Court is Defendant CACI, INC. – FEDERAL's ("Defendant" or "CACI") Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment.  ECF No. 32-1 ("Motion" or "Mot.").  This Motion was filed on March 28, 2025, and Plaintiff James Soeten ("Plaintiff" or "Soeten") filed a Response in Opposition to the Motion on April 30, 2025.  *See* ECF No. 36 ("Opposition" or "Opp'n").  Defendant filed a Reply on May 9, 2025.  ECF No. 37 ("Reply").  On June 5, 2025, the Court found this matter suitable for determination on the papers and without oral argument pursuant to Civil Local Rule 7.1.d.1.  ECF No. 40.  Upon consideration of the Parties' arguments, the record, and the relevant law, IT IS HEREBY ORDERED Defendant's Motion for Summary Judgment is **GRANTED**.

///

1

**BACKGROUND**

2      CACI is a United States "multinational professional services and information

3  technology company" with its headquarters located in Virginia. Mot. at 6.[1]  CACI contracts

4  its services, including background checks, to "many branches of the United States

5  government including defense, homeland security, intelligence and healthcare."  *Id*.; *see*

6  *also* Opp'n at 5.  On August 1, 2016, CACI hired Plaintiff to work full-time in a

7  "Background Investigator III" position based in San Diego County.  Mot. at 5.  Plaintiff

8  has held a credential from the Defense Counterintelligence and Security Agency ("DCSA")

9  for over fifteen years.  Opp'n at 7; ECF No. 36-2 ("Plaintiff Decl.") ¶ 8.[2]  About three years

10 into his employment, Plaintiff was promoted to "Background Investigator IV" in June of

11 2019.  Mot. at 5.  According to CACI, "[a] Background Investigator conducts

12 comprehensive interviews with Subjects, employers, associates, references, and other

13 knowledgeable individuals and reviews appropriate records to obtain facts to resolve all

14 material issues in a case or to establish the background, reputation, character, suitability,

15 or qualifications of the Subject under investigation."  Mot. at 5-6.

16 **I.    CACI'S INITIAL INVESTIGATION INTO PLAINTIFF'S WORK**

17     In or around March of 2022, an investigation was initiated by CACI's Investigation

18 Oversight ("IO") team due to concerns about the high volume of items Plaintiff was

19 "manually updating" on numerous cases.  Mot. at 9.  According to Kristi Bereznai, one of

20 CACI IO's investigators, the initial investigation into Plaintiff's work uncovered that, in

21 eight of Plaintiff's cases between September of 2021 and April of 2022, the number of

22 records reported to DCSA was "10," when it should have been "01."  Mot. at 6; ECF No.

23 32-3 ("Bereznai Decl.") ¶ 3.  Additionally, according to Catherine Parham, CACI's

24

25  ────────────────

26 [1]     Unless otherwise stated, page numbers referenced herein refer to page numbers

27 generated by the CM/ECF system.

[2]     Citations to declarations will refer to the paragraph numbers that appear on the

28 document itself.

Program Manager overseeing "all of the background investigation programs," and Bereznai, CACI IO "found an item it believed was potentially falsified by [Plaintiff]." ECF No. 32-4 ("Parham Decl.") ¶ 4; *see also* Bereznai Decl. ¶ 4. Parham explains this potential falsification was flagged because "[o]ne agency that reported 'NR' (no records) also reported that there was no evidence that Mr. Soeten conducted the check by submitting the request with the required record release." Parham Decl. ¶¶ 2, 4; Bereznai Decl. ¶ 4.

On March 12, 2022, CACI submitted to DCSA Office of Inspector General ("DCSA OIG") a letter outlining its concerns over the results of the investigation. Parham Decl. ¶ 5; Bereznai Decl. ¶ 3. Additionally, according to Parham, the "potential falsification prompted the need to immediately suspend Mr. Soeten." Parham Decl. ¶ 4. Indeed, on April 11, 2022, CACI suspended Plaintiff's employment due to the pending investigation. Mot. at 9; Plaintiff Decl. ¶ 10. Just over a month later, on April 20, 2022, CACI sent a second notification to DCSA, outlining "[Plaintiff's] April 11 suspension and [CACI's] proposal to conduct an eight case sampling of those cases." Parham Decl. ¶ 5; *see also* Bereznai Decl. ¶ 6. DCSA OIG responded the following day, "directing [CACI to conduct] an inquiry into the concern, including a sampling audit of ten cases[.]" Parham Decl. ¶ 5; *see also* Bereznai Decl. ¶ 7.

## II. CACI IO'S FIRST TEN-CASE AUDIT OF PLAINTIFF'S WORK

As directed by DCSA OIG, CACI IO conducted the first of two ten-case audits of Plaintiff's work between April and May of 2022 (the "April 2022 audit"). Bereznai was again the CACI IO investigator assigned to Plaintiff's case and handled all correspondence with DCSA OIG. Bereznai Decl. ¶ 2. In fact, Bereznai oversaw the April 2022 audit. Bereznai Decl. ¶ 8. According to Bereznai, the audit revealed discrepancies and concerns pertaining to Plaintiff's handwritten notes for nine out of the ten cases. *Id.* Among other issues, Bereznai explains the notes "were extremely hard to read, did not include required information, contained information different than [Plaintiff] reported in the Record of Investigation ("ROI") and/or were not on the required forms." *Id.*

On May 20, 2022, CACI sent a memorandum prepared by Bereznai to DCSA OIG detailing Bereznai's findings from the April 2022 audit, including but not limited to:

(1)  Plaintiff had an "extremely high Record Obtained number on numerous cases over six months."  Bereznai Decl. ¶ 9, Ex. 5, ECF No. 39-4 ("Ex. 5") at 7.  According to the memorandum, a typical case only has one record obtained for "NI and NR" events, but many of Plaintiff's cases indicated ten records obtained.  *Id*. at 2.

(2) In one case, a source informed Plaintiff of the subject's foreign family members, "to include an aunt and grandmother who are citizens of Thailand … and uncles and cousins living in Canada," however, Plaintiff reported the source was unaware of the subject having any close or continuing contact with foreign nationals.  *Id*. at 3.

(3) In another case, two sources "provided knowledge of the Subject's foreign relatives, though they are reported as being unaware of any."  *Id*.

(4) In another case, a source was reported as having monthly contact with the subject and recommending the subject, though the source told CACI IO "she does not know the Subject well enough to recommend her."  *Id*.

(5) CACI IO attempted to confirm the validity of nine records that had been manually updated to show they were completed.  *Id*.  However, two of these records were missing and the agencies the records purportedly came from indicated "they do not have anything on their log indicating a record was provided to Investigator Soeten."  *Id*. at 4.

(6) In another case, CACI IO found Plaintiff "incorrectly marked the Subject's date of birth and social security number as verified, though only the Subject's month and day of birth and last four of the social security number were shown on the record."  *Id*. at 6-7.

In addition to highlighting the concerns uncovered regarding Plaintiff's work by CACI IO, Bereznai's memorandum also included a proposed course of action for Plaintiff.  *Id*. at 7-8.  The proposed course of action started with confronting Plaintiff, and, if he admitted to updating the number of records obtained from one to ten without a valid explanation, he

would be terminated immediately. *Id*. at 7 (explaining this conduct is a form of falsification). On the other hand, if Plaintiff was unaware of the requirements or was confused about how to properly record, CACI IO would provide Plaintiff with a "Final Written Warning" and inform him he would be terminated if his performance did not improve. *Id*. The proposed course of action also included providing Plaintiff with additional training. *Id*. at 7-8.

DCSA OIG responded to Bereznai's memorandum on May 25, 2022, and agreed with the proposed course of action for Plaintiff. Mot. at 5; Bereznai Decl. ¶ 10, Ex. 6, ECF No. 39-5 ("Ex. 6") at 2. Additionally, DCSA OIG directed CACI to report to DCSA OIG the results of the confrontation with Plaintiff by June 8, 2022. *Id*.

Per the proposed course of action in Bereznai's memorandum, Bereznai confronted Plaintiff on May 27, 2022, regarding his "extremely high RO number over six months." Mot. 7; Bereznai Decl. ¶ 11. During this meeting, Plaintiff "did not acknowledge that he updated the number to 10," and so, according to the proposed course of action, Plaintiff was given "verbal counseling, followed by written guidance." Mot. at 7-8; Bereznai Decl. ¶ 11. Furthermore, Plaintiff was required to complete "Oversight Course training" and was provided with "guidance materials Reporting Records and Introduction to Note Taking." *Id*. Additionally, Plaintiff was required to complete "two QA check-rides," and was given a "Final Written Warning upon his return from a leave and vacation on or around July 28, 2022." Bereznai Decl. ¶ 11; Bereznai Decl. ¶ 11, Ex. D, ECF No. 32-12 ("Ex. D"). On June 3, 2022, CACI sent an update to DCSA OIG detailing the confrontation with Plaintiff and subsequent action steps. Berenzai Decl. ¶ 12. A few days later, DCSA OIG acknowledged the update and "considered the concern closed." Bereznai Decl. ¶ 12.

## III.    PLAINTIFF'S AUGUST 30, 2022, EMAIL

On August 30, 2022, Plaintiff sent an email to Jill Berenji, CACI's West Coast Region Manager, and Brandishea Nugent, a CACI Section Lead and Plaintiff's supervisor. Exhibit E, ECF No. 32-13 ("Ex. E"). In this email, Plaintiff voiced his frustration with his suspension and the IO investigation. Plaintiff dedicated a large portion of this email to

criticizing a call he had with CACI IO during the investigation.  Plaintiff describes, "the common theme … of the call [with IO]" was that "IO thought they [k]new I had done things incorrectly but when pointed out they just moved on to their next point."  Ex. E at 2.  Plaintiff then went on to criticize the supplemental training he was forced to complete as out of date:

> This training was outrageously wrong and/or out of date.  For example, there is an ESI example dated 10/11/2013 that does not disclaim the adjudicative guidelines were asked, there is a source job aid example dated 04/2016, handwritten empl record example(not on a job aid) dated 09/03/2005(not a typo), references to PRSI's and OPM/NBIB, and videos that contradicted the written examples.

Ex. E at 2.  Plaintiff claims he "put in [his] resignation at CACI" on August 29, 2022, in part, because he was "required to re-take certain trainings … which were incorrect, inaccurate, and … out of date."  Plaintiff Decl. ¶ 16.  Plaintiff also states he spoke to Berenji and Nugent on the phone around the same time.  *Id*.  However, according to Plaintiff, he "continued [his] employment at CACI after [he] was assured that these concerns would be addressed and fixed."  *Id*.

**IV.    CACI IO'S SECOND TEN-CASE AUDIT OF PLAINTIFF'S WORK**

Several months later, on November 22, 2022, DCSA OIG asked CACI to conduct a "ten-case follow-up audit," for which DCSA OIG provided the case numbers of the cases it wanted audited.  Bereznai ¶ 13; Ex. 7, ECF No. 39-6 ("Ex. 7") at 2.  DCSA OIG specifically directed CACI to provide DCSA OIG with the results and a proposed course of action by December 22, 2022, and that "CACI not discuss this matter with the investigator in question [Plaintiff]."  *Id*. at 3.

CACI complied, and CACI IO conducted another audit of Plaintiff's cases (the "December 2022 audit").  Mot. at 8; Bereznai Decl. ¶ 15.  Bereznai was again responsible for preparing the corresponding report that was sent to DCSA OIG on December 22, 2022.  Bereznai Decl. ¶ 16.  The report found "53 validated Items, 13 undetermined Items, and zero Items indicated falsification."  Bereznai Decl. ¶ 16, Ex. 8, ECF No. 39-7 ("Ex. 8") at

3.    However, as in the April 2022 audit, there were several issues found during the December 2022 audit, including:

(1) Several sources told CACI IO that Plaintiff was not as thorough with his questions as CACI IO, and two sources indicated Plaintiff did not advise them about the Privacy Act of 1974.  Ex. 8 at 4.

(2) During subject interviews, CACI IO "obtained discrepancies in education and employment dates, military service numbers and duty station building numbers, and clarifications to listed relatives' information."  *Id*.

(3) Regarding validated records, CACI IO uncovered "discrepant job title, job status, and job location as well as a reason for leaving not previously reported … and that the Subject's SSN and DOB are not shown, while [Plaintiff] reports these are verified, and developed attendance at other schools not previously reported."  *Id*. at 5.

(4) Plaintiff's handwritten notes are described as "consistently hard to read or decipher without consulting his ROI, and often illegible."  *Id*. at 6.

(5) Plaintiff's "ROIs frequently included information or more details not included in his handwritten notes."  *Id*.  For example, "[Plaintiff] consistently reports full addresses and details which are listed in the case papers but not present in his notes."  *Id*.

(6) While "[Plaintiff] did use the required CACI Subject Interview job aid, CACI IO noted he did not consistently notate asking all required questions."  *Id*.

(7) In one case, Plaintiff interviewed sources with knowledge of the subject's military history, but Plaintiff's handwritten notes "did not show the Sources were asked if they knew the dates of the Subject's employment, the Subject's job location, if the Subject had any security violations, nor if they were aware of the Subject's previous employment or duty stations."  *Id* at 7.

In concluding the report, Bereznai informed DCSA OIG that CACI IO was working with Human Resources to determine the best course of action and that CACI IO would inform DCSA OIG when a final determination was made.  *Id* at 8.

## V.    DECISION TO TERMINATE PLAINTIFF AND DCSA OIG'S REQUEST FOR A THIRD AUDIT

On December 22, 2022—the same day Berenzai's report was sent to DCSA OIG—a meeting was held between CACI IO Investigator, Lindsey Jennings, CACI Field Operations Manager overseeing the DCSA contract, Loren Schmidt, Human Resources business partner, Catherine McDaniel, as well as Parham and Bereznai.  ECF No. 32-6 ("Schmidt Decl.") ¶ 8; Parham Decl. ¶ 12; Bereznai Decl. ¶ 18.  The purpose of this meeting was to discuss the results of the December 2022 audit and what course of action to take regarding Plaintiff's employment.  Schmidt Decl. ¶ 8; Parham Decl. ¶ 12.  During this meeting, Parham recommended terminating Plaintiff "based on continuing concerns with his fieldwork and compliance requirements, as described in the Final Written Warning given to [Plaintiff] on or around July 28, 2022[.]"  Parham Decl. ¶ 12.  McDaniel and Schmidt agreed with the recommendation to terminate Plaintiff.  Parham Decl. ¶ 12; Schimdt Decl. ¶ 8.  Plaintiff does not dispute that Parham, McDaniel, and Schmidt formed the opinion Plaintiff should be terminated during this meeting.  *See* Plaintiff's Response to Separate Statement of Material Facts, ECF No. 36-1 ("RSS") at 23, 25.[3]

On December 23, 2022—the day after Bereznai sent her report to DCSA OIG—DCSA OIG responded to CACI.  Mot. at 8; Bereznai Decl. ¶ 17, Ex. 9, ECF No. 39-8 ("Ex. 9") at 2.  DCSA OIG explained Bereznai's report "identified multiple subjects, sources, and records that were not accurately reported by Soeten as he is not conducting thorough interviews and not reporting all pertinent information."  Ex. 9 at 2.  Because of these inaccuracies, DCSA OIG requested that CACI again perform a ten-case audit—providing the specific case numbers to be audited—and report back to DCSA OIG the results by January 22, 2023.  Ex. 9 at 2-3.  However, at this point, Parham, McDaniel, and Schmidt had already agreed termination was the best course of action.  *See* RSS at 23, 25.

---

[3]    Citations to Separate Statements of Material Facts will refer to the paragraph numbers that appear on the document itself.

On January 3, just after the holidays, Parham discussed terminating Plaintiff with Andrew Butler, the Vice President of Vetting Solutions Division at CACI. Parham Decl. ¶ 13; ECF No. 32-5 ("Butler Decl.") ¶ 3; Opp'n at 9. During the discussion, Butler was reminded of the initial April 2022 audit, Plaintiff's suspension, and "potential fraud in [Plaintiff's] reporting." Butler Decl. ¶ 3. Additionally, Parham informed Butler of the results of the more recent December 2022 audit, which revealed further issues with compliance requirements and inaccuracies in reporting. Butler Decl. ¶ 4; Parham Decl. ¶ 13. Based on the audits of Plaintiff's work, Butler agreed with Parham's recommendation for termination, and Butler informed Parham he would discuss the matter with Frank Abramcheck, a Director at CACI.[4]  Butler Decl. ¶ 5. Parham memorialized her recommendation in an email to Schmidt, McDaniel, and Butler on January 4, 2023, writing: "It is my recommendation that Inv. Soeten be termed due to continued concerns with his fieldwork and compliance requirements." Parham Decl. ¶ 13, Ex. H, ECF No. 32-16 ("Ex. H") at 2.. On January 10, 2023, McDaniel followed up with Butler, and Butler "conveyed [his] agreement and decision to terminate Mr. Soeten's employment." Butler Decl. ¶ 6. Plaintiff was sent an official termination letter on January 19, 2025, which cited his reason for termination as "unsatisfactory performance." ECF No. 32-19 ("Exhibit K"); Plaintiff Decl. ¶ 19.

## VI.    PLAINTIFF'S JANUARY 6, 2023, EMAILS TO JILL BERENJI AND LINDSEY JENNINGS

Sometime in December or early January of 2023, Plaintiff became aware CACI IO had performed a second audit of his work. In response, Plaintiff sent an email on January 6, 2023, to Berenji and McDaniel. Exhibit I, ECF No. 32-17 ("Ex. I"). In his email, Plaintiff expressed concerns over the integrity of the audit, writing:

---

[4]    The Court cannot find any other reference to Frank Abramcheck in the Parties' briefing. However, Abramcheck is addressed as a "Director" of CACI Premier Technology in a letter sent by DCSA OIG.  *See* Ex. 6 at 2.

IO should have had my notes/transcripts hardcopy and the other investigators at the time they deleted my ROI and replaced it with the other Investigators ROI. It appears IO does not do any vetting on who conducts IO work on their behalf. The said ROI for the transcripts have an incorrect attendance span ending in 2019 when Subject attended through Spring 2020, a wrong cumulative GPA, reflecting that they verified the location of the attendance (which is not reflected on the transcripts and usually is not), and that they verified the months the semesters run claiming they received this from the record provided.

…

If they just believed every other Investigators work is correct without looking at any notes, then of course I am going to fail. I feel like IO is on a witch hunt and retaliating against me because of the prior email to Jill in August documenting the ills of IO, Policy, and training (prior email attached).

…

I just don't understand how my colleagues, Section Lead, and Regional Manager all think I am doing a great job and IO can just continue to slander my name.

Ex. I at 2. Plaintiff re-asserted these concerns—about the same case in which Plaintiff believed an IO Investigator replaced his ROI with an ROI that contained incorrect educational history for the subject—in an email to Jennings also on January 6, 2023. Exhibit J, ECF No. 32-18 ("Ex. J") at 2. In this email, Plaintiff again expressed his objections to IO's procedures, arguing, "I know sources often have different answers for the second interview after they were able to think about the interview between the first and second one." *Id.*

Butler acknowledges he reviewed Plaintiff's January 6 email (though it is unclear which one). Butler Decl. ¶ 7. Butler explains, "[w]hile I cannot recall when I reviewed the email, I am confident that my approval of the decision to terminate Mr. Soeten was based solely on CACI's continued concerns with Mr. Soeten's fieldwork and compliance requirements." *Id.*

Additionally, Plaintiff submitted portions of Parham's deposition, which are authenticated by the Declaration of Samuel Clemens. ECF No. 36-3 ("Clemens Decl.") ¶ 5, Ex. N. In her deposition, Parham acknowledges receiving the January 6 emails and

investigating Plaintiff's accusation about the IO Investigator incorrectly changing a subject's education information. *See* Clemens Decl., Ex. N at 103:21-105:7.[5]  Parham explained, "[w]ith regard to a single education record, I believe there were two differences in what was reported in comparison to what was discussed with the rework investigator." *Id*. at 104:16-19.  However, regarding those differences, Parham went on to say, "the two particular errors that were updated in the report of investigation [ROI] had no bearing on any determining factor." *Id*. at 105:11-13.

## VII.  PROCEDURAL HISTORY

Plaintiff originally filed this lawsuit in San Diego Superior Court on October 20, 2023.  ECF No. 1 at 17.  Plaintiff alleged two causes of action related to his termination: (1) a violation of California Civil Code Section 3294 for retaliation against a whistleblower; and (2) a violation of California Civil Code Section 3294 for wrongful termination in violation of public policy.  *Id*. at 24-25.  On January 5, 2024, CACI removed this case to federal court under diversity jurisdiction pursuant to 28 U.S.C. Section 1332.  *Id*. at 1-7.  CACI's Motion for Summary Judgment is the first dispositive motion filed in this case.

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 empowers courts to enter summary judgment on claims or defenses that lack a factual foundation.  Rule 56(a) limits summary judgment to cases where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. PRO. 56(a).  The moving party carries the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).

---

[5]  Citations to depositions will refer to the page and line numbers that appear on the document itself.

> If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything . . . . In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything.

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102-03 (9th Cir. 2000). However, if "a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. Then, the opposing party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (citing FED. R. CIV. P. 56(e)). However, "[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

It has long been held that "[t]he court must examine the evidence in the light most favorable to the non-moving party." *United States v. Diebold, Inc.*, 369 U.S. 654 (1962). Summary judgment should be denied if any issue of material fact exists. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Finally, it is not the role of the court to weigh evidence, determine credibility, and draw inferences from facts when deciding a motion for summary judgment. *Id.*

## DISCUSSION

## I.    EVIDENTIARY OBJECTIONS

On a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). An "objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *See* Advisory Committee's Notes on 2010 Amendment to FED. R. CIV. P. 56. At the summary judgment stage, the court may consider inadmissible evidence if it may be presented in an admissible form at trial. *See Celotex Corp.*, 477 U.S. at 324 ("We do not mean that the

nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (holding the contents of the plaintiff's diary admissible for purposes of summary judgment because the contents would be admissible at trial through the plaintiff's personal knowledge).

Additionally, not all objections that would be proper at trial are proper during the summary judgment stage. For example, relevance and improper legal conclusion objections are moot and duplicative of the summary judgment standard. *See Sec. & Exch. Comm'n v. Criterion Wealth Mgmt. Servs., Inc.*, 599 F.Supp.3d 932, 945 (C.D. Cal. 2022); *McCarthy v. R.J. Reynolds Tobacco Co.*, 2011 WL 13405571, at *1 (E.D. Cal. Mar. 31, 2011) (holding relevance, improper legal conclusion, speculation, and argumentative objections are duplicative of the summary judgment standard and are, therefore, improper); *Holt v. Noble House Hotels & Resort, Ltd.*, 370 F.Supp.3d 1158, 1164 (S.D. Cal. 2019). However, a district court "must … rule on evidentiary objections that are *material* to its ruling." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (emphasis added).

Here, Plaintiff raises fourteen evidentiary objections to the declarations and exhibits submitted by CACI in support of its Motion. ECF No. 36-4 ("P's Objections"). The Court treats these objections categorically, where appropriate.

**A. Plaintiff's Objections to the Declaration of Catherine Parham**

**1. Plaintiff's Objections 1 and 2**

Plaintiff objects to portions of Paragraphs 4 and 6 of Parham's declaration in which Parham describes the results of CACI IO's initial investigation into Plaintiff's work and how it prompted his suspension. P's Objections at 1-2. Plaintiff argues: (1) Parham lacks personal knowledge to support these statements, and (2) these statements are hearsay as they pertain to the underlying reports of CACI IO's investigation. *Id*.

Generally, Federal Rule of Evidence 602 limits a witness's testimony to matters for which "evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Personal knowledge dictates "a witness' testimony be based on

events perceived by the witness through one of the five senses." *L.A. Times Commc'ns, LLC v. Dep't of Army*, 442 F.Supp.2d 880, 886 (C.D. Cal. 2006). However, personal knowledge may also be inferred from the witness's position in a corporation. *See In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2000) (holding the declarant's "five-year tenure as Arrow's credit manager lends support to his claim of 'personal knowledge' of industry practice"); *see also Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1330 (9th Cir. 2000) ("As a corporate officer of SRF, Ananda Mata could be expected to know the identity of SRF employees and their tasks"). This is appropriate where presuming personal knowledge based on an affiant's position in a company is "common-sense." *Compare MAG US Lounge Mgmt., LLC v. Ontario Int'l Airport Auth.*, 2022 WL 17664000, at *1 (9th Cir. Dec. 14, 2022) ("we have followed the common-sense rule that '[p]ersonal knowledge can be inferred from an affiant's position' in a company"); *with United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills Cal.*, 298 F.Appx. 545, 551 (9th Cir. 2008) (where the affiant "did not state he created or even reviewed the summary exhibits, and there is nothing about his job description that requires a court to presume he did").

Additionally, Federal Rule of Evidence 701 governs the admissibility of opinions by lay witnesses. Rule 701 limits lay witness opinions to ones that are: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

Here, Parham explains she has personal knowledge of these statements, and she describes her position as Program Manager as managing "support operations for the division that is comprised of all the background investigation programs, including the Defense Counterintelligence and Security Agency." Parham Decl. ¶ 2. Therefore, it is a reasonable presumption that she would be familiar with and privy to the investigations into Plaintiff's work. Accordingly, the Court finds Parham has sufficient personal knowledge to testify to the statements in question. Moreover, the Court does not find any lay witness

opinions offered in Parham's statement. Rather, Parham repeats some of the conclusions of CACI IO's investigation.

As for hearsay grounds, evidence of out of court statements offered for the truth of the matter asserted are barred by the rule against hearsay. FED. R. EVID. 801, 802. However, when evidence of an out of court statement is submitted for some purpose other than the truth of the matter asserted—such as effect on the listener—it is not barred by the rule against hearsay. *See Baker v. Delta Air Lines, Inc.*, 6 F.3d 632, 643 (9th Cir. 1993).

To the extent—if any—that Parham's references are hearsay in so far as they rely on the reports of CACI IO's investigations into Plaintiff's work, this evidence can still be produced in an admissible form at trial. *See Celotex Corp.*, 477 U.S. at 324 (evidence during the summary judgment stage need not be in an admissible form so long as it can be presented in an admissible form at trial). The memorandums detailing the results of CACI IO's investigations can be authenticated by Bereznai (their author) at trial, and they are not hearsay because they are not offered for the truth of the matter asserted but rather the effect on the listener. Whether Plaintiff did or did not cause the errors described in these reports is not an issue in this case. Rather, the issue is whether Plaintiff's supervisors terminated Plaintiff based on what the investigations reported or out of retaliation for Plaintiff's alleged whistleblower disclosures. Accordingly, Plaintiff's objections to Paragraphs 4 and 6 of Parham's declaration are **overruled**.

### 2. Plaintiff's Objections 3, 4, and 5

Plaintiff objects to three portions of Paragraph 12 of Parham's Declaration: (1) "On December 22, 2022, Ms. Jennings reviewed and internally discussed the preliminary results of this sampling audit with Ms. McDaniel, myself, and Loren Schmidt, Field Operations Manager"; (2) "During this meeting, after discussing the results of the recent sampling audit, the concerns found during the sampling audit and rework, in April and May of 2022 … I recommended that Mr. Soeten's employment with CACI be terminated"; and (3) "Ms. McDaniel and Mr. Schmidt agreed with the recommendation and came to the decision to

terminate Mr. Soeten's employment." P's Objections at 2-3. Plaintiff argues these statements constitute inadmissible hearsay. *Id.*

These statements from Parham describe a conversation to which she was a party. Parham's statements that the conversation occurred, describing who participated, and her own involvement in the discussion are not out of court statements for hearsay purposes. However, Parham's statements that McDaniel and Schmidt agreed with her recommendation to terminate Plaintiff do constitute out of court statements made by McDaniel and Schmidt offered for the truth of the matter asserted and are, therefore, hearsay. As to Schmidt's statement, this evidence can be cured at trial with Schmidt's testimony, as Schmidt mentions in his declaration that he agreed with the decision to terminate Plaintiff during the December 22, 2022, meeting. Schmidt Decl. ¶ 8. While no such declaration is submitted from McDaniel, Plaintiff's objection to this point is moot because Plaintiff concedes in his Response to Separate Statement of Facts that "Ms. McDaniel and Mr. Schmidt formed such an opinion [to terminate Plaintiff] based solely upon the information provided to them" during the December 22, 2022, meeting. RSS at 25. Therefore, Plaintiff's objection to Parham's hearsay statement about McDaniel's opinion is immaterial to the Court's ruling because Plaintiff concedes the fact. *See Norse*, 629 F.3d at 973 (courts need only rule on evidentiary objections that are material to their summary judgment decision).[6] Accordingly, Plaintiff's objections 3, 4, and 5 to the Declaration of Catherine Parham are **overruled**.

### 3. Plaintiff's Objection 6

Plaintiff objects to another portion of Paragraph 12 of Parham's Declaration in which she states: "My recommendation to terminate Mr. Soeten's employment was solely based on the continuing concerns with his fieldwork and compliance requirements, as described

---

[6] Additionally, Plaintiff never argues retaliation was a contributing factor to McDaniel's opinion that Plaintiff should be terminated, further demonstrating the hearsay objection is immaterial to the Court's ruling. *See generally* Opp'n.

in the Final Written Warning given to Mr. Soeten on or around July 28, 2022, Ms. Jenning's email of December 22, 2022, and the summary reports from CACI's Investigations Oversight team to DCSA." P's Objections at 3. Plaintiff again asserts Parham lacks personal knowledge, the statement constitutes an improper lay opinion, and the statement contains hearsay.

Here, as discussed in the preceding objections, Parham's statement is neither without personal knowledge nor does it form an improper lay opinion. There is no question Parham has personal knowledge of her own decision to recommend Plaintiff's termination, and she can competently testify to what influenced her decision. As for her statement's reference to specific documents, those documents are not referenced for the truth of the matter asserted, but rather how they influenced Parham's recommendation. Additionally, to the degree the Court relies on any of those documents, they have been submitted as exhibits to CACI's Motion with declaration's authenticating them, making this evidence admissible in the form of the documents themselves at trial. *See Celotex Corp.*, 477 U.S. at 324. Accordingly, Plaintiffs' Objection 6 to Parham's Declaration is **overruled**.

## B. Plaintiff's Objections to the Declaration of Kristi Bereznai

### 1. Plaintiff's Objections 1-5

Plaintiff objects to five portions of the Declaration of Kristi Bereznai, all of which discuss the findings of CACI IO's investigations, as inadmissible hearsay. P's Objections at 3-5.

Here, Bereznai was part of CACI's Investigations Oversight team that initially looked into Plaintiff's work in March of 2022, and she prepared the report that is attached to her declaration as Exhibit 1. Bereznai Decl. ¶ 3. Bereznai also oversaw the April 2022 audit, and again she prepared the report that is attached as Exhibit 5. *Id.* ¶¶ 8, 9. Furthermore, Bereznai prepared and sent to Plaintiff the Final Written Warning that is attached to her declaration as Exhibit D. *Id.* ¶ 11. Finally, Bereznai also participated in the CACI IO team that conducted the December 2022 audit, and Bereznai again prepared the report attached as Exhibit 8. *Id.* ¶¶ 13-16. As a participant in all the relevant

investigations, and as author of their reports, Bereznai can testify to the investigations and their findings from personal knowledge at trial. Furthermore, even if these reports are out of court statements, they would not be offered for the truth of their findings, but rather how they affected the decision to terminate Plaintiff's employment. Therefore, neither Bereznai's statements nor the reports are inadmissible hearsay. Accordingly, Plaintiff's objections to Bereznai's declaration are **overruled**.

### C. Plaintiff's Objections to the Declaration of Loren Schmidt

#### 1. Plaintiff's Objection 1

Plaintiff objects to a portion of Paragraph 8 of the Declaration of Loren Schmidt in which he states: "My decision to terminate was based solely on the continuing concerns with Mr. Soeten's fieldwork and compliance requirements, as revealed in the initial sampling audit and, despite the course of action taken in May through August, Mr. Soeten did not improve." P's Objections at 5. Plaintiff objects to this statement, claiming again that Schmidt lacks personal knowledge, offers an improper lay opinion, and the statement contains hearsay. As with Parham, Schmidt has personal knowledge of his own decision-making process and can testify to what influenced his decision. Furthermore, no opinion is offered in this statement. Rather, the statement is a recollection of what Schmidt decided and how he came to that decision. Finally, to the extent Schmidt's reference to the sampling audit and course of action may constitute an out of court statement, it is not offered for the truth of the matter, but rather how those investigations influenced Schmidt's decision to terminate Plaintiff. Accordingly, Plaintiff's objection to Schmidt's declaration is **overruled**.

### D. Plaintiff's Objections to the Declaration of Andrew Butler

#### 1. Plaintiff's Objection 1

Plaintiff objects to a portion of Paragraph 5 of the Declaration of Andrew Butler, in which he states: "With this knowledge, I agreed with Ms. Parham's recommendation on January 3, 2023, to terminate Mr. Soeten's employment due to the continuing concerns with his fieldwork and compliance requirements." P's Objections at 6. Plaintiff objects to

1   this statement, claiming again—as with Schmidt's statement—that Butler lacks personal

2   knowledge, offers an improper lay opinion, and the statement contains hearsay.  For the

3   same reasons discussed *supra*, Plaintiff's objection to Butler's declaration is **overruled**.

### E. Plaintiff's Objection to CACI's Exhibits 1-9

#### 1.  Plaintiff's Objection 1

Finally, Plaintiff makes a broad hearsay objection to CACI's Exhibits 1-9, which are filed under seal and largely constitute the reports submitted to DCSA OIG containing the results of CACI IO's investigations and audits into Plaintiff's work.  P's Objections at 6. Plaintiff's objection is a "'blanket objection[] without analysis applied to specific items of evidence.'"  *Capitol Recs., LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010) (quoting *Doe v. Starbucks, Inc.*, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009).  Plaintiff offers no explanation as to how the exhibits generally, let alone each individual exhibit, are barred by the rule against hearsay.  Nevertheless, these documents are not hearsay as they are not offered for the truth of their contents but rather their effect on the decision-makers who determined terminating Plaintiff was the best course of action. Furthermore, even if these documents were hearsay, Bereznai prepared all the reports and participated in all the investigations pertaining to this case and can, therefore, competently testify to their contents based on her personal knowledge.  Therefore, the evidence can be presented in an admissible form at trial. *See Celotex Corp.*, 477 U.S. at 324.  Accordingly, Plaintiff's objection to CACI's Exhibits 1-9 is **overruled**.

## II.   CACI'S MOTION FOR SUMMARY JUDGMENT

### A. Plaintiff's Whistleblower Retaliation Claim

CACI's argument for summary judgment against Plaintiff's whistleblower retaliation claim is twofold:  (1) CACI claims Plaintiff cannot show he engaged in a "protected activity" because Plaintiff never disclosed a violation of the law; and (2) CACI suggests, even if Plaintiff did engage in a protected activity, Plaintiff was terminated for legitimate and independent non-retaliatory reasons.  *See generally* Mot.

California Labor Code Section 1102.5 prohibits an employer from retaliating against an employee for sharing information the employee "has reasonable cause to believe … discloses a violation of state or federal statute" or of "a local, state, or federal rule or regulation" with "a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance." CAL. LAB. CODE § 1102.5(a)-(b). The purpose of Section 1102.5 is "to encourage workplace whistle-blowers to report unlawful acts without fearing retaliation." *Hansen v. Dep't of Corrs. & Rehab.*, 171 Cal.App.4th 1537, 1545-46 (2008) (internal quotations omitted). Section 1102.6 provides a three-prong framework for analyzing these cases: (1) the employee must demonstrate by a preponderance of the evidence he or she engaged in a protected activity; (2) the employee must demonstrate by a preponderance of the evidence retaliation for the employee's protected whistleblower activity was a contributing factor to a contested employment action; and, (3) once the employee has satisfied the first two prongs, "the employer then bears the burden of demonstrating by clear and convincing evidence that it would have taken the same action 'for legitimate, independent reasons.'" *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal.5th 703, 707 (2022) (citing CAL. CIV. CODE § 1102.6).[7] Each prong will be discussed in turn.

### 1. Whether Plaintiff Engaged in a "Protected Activity"

First, CACI argues retaliation could not have been a contributing factor because Plaintiff never engaged in a "protected activity." *See* Mot. at 12-17. CACI argues Plaintiff's alleged disclosures did not point to any violations of federal or state laws or regulations, but rather were "made solely in the context of an internal personnel matter

---

[7] Some California courts continued to apply the burden-shifting framework from the United States Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) in the years after California Labor Code Section 1102.6 became law. *Lawson*, 12 Cal.5th at 707. However, the California Supreme Court has since clarified Section 1102.6 provides the framework for these cases, and employees "need not satisfy the *McDonnell Douglas* test[.]" *Id.*

based on [Plaintiff's] disagreement with disciplinary action taken against him[.]" *Id.* at 13. Plaintiff, on the other hand, argues he did engage in a protected activity by reporting to his supervisors "information that he reasonably believed resulted or could result in violations of law, specifically, 18 U.S.C. § 1001, a catch-all statute that prohibits false or fraudulent statements to the U.S. Government." Opp'n at 14. Plaintiff also suggests his alleged disclosures could fall under 50 U.S.C. Section 3341 *et seq*., but Plaintiff does not explain how he represented a violation of this statute. *Id.*

Indeed, to satisfy the first prong of the analysis set forth in California Labor Code Section 1102.6, an employee must demonstrate "retaliation for an employee's *protected activities* was a contributing factor in a contested employment action." *Lawson*, 12 Cal.5th at 718. For purposes of Section 1102.5, an employee engages in a protected activity when the employee discloses "a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation" to "a person with authority over the employee, or to another employee who has authority to investigate." CAL. CIV. CODE § 1102.5.

"Under [Section 1102.5], the relevant inquiry is not whether the conduct 'actually violated' any specific statute or regulation, but whether the plaintiff '*reasonably believed* that there was a violation of a statute, rule, or regulation' at the time it was reported." *Killgore v. SpecPro Pro. Servs., LLC*, 51 F.4th 973, 988 (9th Cir. 2022) (citing *Nejadian v. Cnty. of L.A.*, 40 Cal.App.5th 703 (2019)); *see also People ex rel. Garcia-Brower v. Kolla's, Inc.*, 14 Cal.5th 719, 734 (2023) (holding "the protections of section 1102.5(b) apply only where the disclosing employee 'has reasonable cause to believe that the information discloses a [legal] violation'").

In *Ross v. County of Riverside*, the plaintiff, a district attorney, informed his supervisor about exculpatory evidence in a homicide case and recommended dismissal. 36 Cal.App.5th 580, 592 (2019). The plaintiff "based this recommendation, at least in part, on his belief continued prosecution would violate the defendant's due process rights as well as the prosecutor's ethical obligations under state law." *Id*. While the plaintiff "did not

expressly state in his disclosures that he believed the County was violating or not complying with a specific state or federal law[,]" the court found Section 1102.5 does not require employees to expressly state a violation of the law, but rather "[i]t requires only that an employee disclose information and that the employee reasonably believe the information discloses unlawful activity." *Id*. at 593.

In *Ross*, the plaintiff's disclosure was founded in actual violations of federal constitutional law and state ethics laws. Whereas, in *Mueller v. County of Los Angeles*, the plaintiff's alleged disclosure was founded in no such state or federal law. 176 Cal.App.4th 809. In *Mueller*, the plaintiff—a firefighter—publicly stated he disapproved of two firefighters in his department being transferred. *Id*. at 812. Because of these statements, the plaintiff's supervisors retaliated against the plaintiff by harassing him, reprimanding him for "inconsequential matters," and sending him on a temporary departmental transfer. *Id*. at 812-13. In the subsequent lawsuit under Section 1102.5, the plaintiff alleged his public statements described departmental violations of "Cal-OSHA safety regulations." *Id*. at 822. However, the plaintiff did "not cite to the record to support [that] assertion." Therefore, the court found "[m]atters such as transferring employees, writing up employees, and counseling employees are personnel matters," not violations of state or federal laws or regulations. *Id*. Furthermore, the court explained:

> To exalt these exclusively internal personnel disclosures with whistleblower status would create all sorts of mischief. Most damagingly, it would thrust the judiciary into micromanaging employment practices and create a legion of undeserving protected 'whistleblowers' arising from the routine workings and communications of the job site.

*Id*. (quoting *Patten v. Grant Joint Union High School Dist.*, 134 Cal.App.4th 1378, 1385 (2005)).

In *Carter v. Escondido Union High School District*, the plaintiff reported that a fellow educator had instructed a senior athlete to take a "weight gainer" containing creatine, which later resulted in the student's hospitalization. 148 Cal.App.4th 922, 927

(2007).  However, the court pointed out that shakes containing creatine "are not unlawful under either state or federal law" and held the plaintiff failed to show his belief—that he was disclosing a violation of the law—was "reasonable." *Id*. at 933.  Thus, the court found the plaintiff's "failure to identify a statutory or constitutional policy that would be thwarted by his … discharge dooms his cause of action." *Id*. at 935 (quoting *Turner v. Anheuser-Busch, Inc.*, 7 Cal.4th 1238, 1257 (1994)).

Both *Carter* and *Mueller* rely on the holding in *Patten*.  Though the California Supreme Court disapproved of *Patten* for applying the *McDonnell Douglas* framework to Section 1102.5 claims, its discussion of what constitutes a "protected activity" for purposes of Section 1102.5 is still applicable.  *See Lawson*, 12 Cal.5th at 718 n.2 ("we disapprove … *Patten*").  In *Patten*, the plaintiff made several disclosures:  (1) Plaintiff alleged her school was misappropriating some of its Underperforming Schools Program budget rather than return the surplus; (2) Plaintiff received complaints that a male physical education teacher had been peering into the girl's locker room, which Plaintiff disclosed to district supervisors; (3) Plaintiff again informed her superiors a male science teacher had made an "off-color" comment to a female student; and (4) Plaintiff requested additional security staff after an assault took place on the campus.  *Patten*, 134 Cal.App.4th at 1382.

The *Patten* court found the first disclosure of the school's misuse of state funds constituted a protected activity because it followed "a whistleblowing archetype—disclosing the allegedly unauthorized use of public assets." *Id*. at 1386 (citing *Colores v. Bd. of Trs.*, 105 Cal.App.4th 1293, 1312 (2003)).  However, the court found the plaintiff's alleged disclosures involving other teachers' conduct did not constitute a protected activity because "the disclosures indisputably encompassed only the context of *internal personnel matters* involving a supervisor and her employee, rather than the disclosure of a legal violation." *Id*. at 1384-85.

In the instant case, there are two alleged disclosures:  (1) Plaintiff's August 30, 2022, email, and (2) Plaintiff's January 6, 2023, emails.  Because these disclosures are in writing,

there is no genuine dispute of fact as to the content of Plaintiff's disclosures. The Court will look at each in turn to determine if they constitute a protected activity.

### a. August 30, 2022, Email

Plaintiff's August 30, 2022, email clearly falls under the *Mueller* and *Carter* line of cases in that it represents an internal personnel issue with CACI, not the protected disclosure of a violation of federal or state statute or regulation. In fact, the only thing Plaintiff could be said to report in his August 30, 2022, email is that CACI's training is "outrageously wrong and/or out of date." Ex. E at 2. However, even in Plaintiff's Opposition, Plaintiff only points to two federal statutes as possible sources of a violation of law: (1) 18 U.S.C. Section 1001, prohibiting false statements to the government, and (2) 50 U.S.C. Section 3341 *et seq.*, outlining requirements for security clearances. Opp'n at 14-15. However, Plaintiff provides no explanation for how the August 30, 2022, email discloses a violation of either of these statutes. *See generally* Opp'n. On the other hand, Plaintiff uses the August 30, 2022, email to continuously express his dissatisfaction with CACI IO's investigation and audit of his work, stating:

> … to not initially have CACI stand by me or any other Investigator in this situation is hard to take.
> …
> I don't understand how a law check updated as 10 or 1 or whatever the claim maybe [sic] resulted in an audit that was clearly not out to vindicate me.
> …
> … the major rub is having IO tell me I am on probation for the rest of my career.
> …
> … but I need to know CACI has my back, not that IO doesn't.
> …
> I have always maintained the best interest of the company and need the same in return.

Ex. E at 2. Here, like in *Carter*, Plaintiff's inability to point to any statutory or regulatory violation in the August 30, 2022, email "dooms" his cause of action as it pertains to this alleged disclosure. *See Love v. Motion Indus., Inc.*, 309 F.Supp.2d 1128, 1135 (N.D. Cal.

3:24-cv-00043-JAH-BLM

2004) (finding the plaintiff's "silence is telling and indicates a lack of any foundation for the reasonableness of his belief" where the plaintiff failed to "cite any statute, rule, or regulation that may have been violated by the disclosed conduct"). As with the courts in *Mueller* and *Patten*, this Court refuses to construe these internal personnel disclosures as "whistleblower status." There is a legitimate concern that doing so would open the door to a multitude of claimants masquerading as "whistleblowers" who were not contemplated by the legislature in the construction of Section 1102.5. Accordingly, the Court finds Plaintiff did not engage in a protected activity when he sent the August 30, 2022, email.

### b. January 6, 2023, Emails

Plaintiff's January 6, 2023, emails similarly contain internal personnel complaints, as Plaintiff states:

> In the meantime, [CACI IO investigators] are re-working an excessive amount of my cases and had the nerve to farm out the rework to Investigators on my own team and in doing so make it appears [sic] to my colleagues that I have again done something wrong and am under investigation all while my Section Lead routinely refers my colleagues to me for guidance and help answering complex work questions. I just don't understand how my colleagues, Section Lead, and Regional Manager all think I am doing a great job and IO can just continue to slander my name.

Ex. I at 2. Unlike Plaintiff's August 30, 2022, email, Plaintiff does make a specific allegation in his January 6, 2023, emails. Plaintiff explains that IO investigators replaced his ROI in a specific case, and that CACI IO's new ROI contained incorrect information in the subject's education history, including: (1) the wrong end term of the subject's attendance at the institution, (2) the wrong GPA, and (3) incorrectly verifying the location of attendance when the transcripts did not contain that information. *Id*. In his Opposition, Plaintiff suggests this disclosure informed his supervisors of a potential violation of 18 U.S.C. Section 1001, which makes it unlawful for anyone to "knowingly and willfully" make "any materially false, fictitious, or fraudulent statement or representation" to a federal agency. Opp'n at 15.

3:24-cv-00043-JAH-BLM

Nowhere in Plaintiff's January 6, 2023, emails does he disclose information that would support any errors in the IO investigator's ROI were made "knowingly and willfully." Therefore, it appears Plaintiff did not disclose an *actual* violation of a federal statute. However, the standard for Section 1102.5 whistleblower claims is not whether the plaintiff disclosed an *actual* violation, but rather "whether the plaintiff 'reasonably believed that there was a violation of a statute, rule, or regulation' at the time it was reported." *Killgore*, 51 F.4th at 988; *see also Tam v. Qualcomm, Inc.*, 300 F.Supp.3d 1130, 1148 (S.D. Cal. 2018) (explaining "[t]he employee must have an actual belief that the employer's actions were unlawful and the employee's belief, even if mistaken, must be reasonable"). Here, while Plaintiff's alleged belief he was reporting illegal activity to his supervisors may have been mistaken, the reasonableness of his belief is a question for the trier of fact. *See Berggren v. Metro. Life Ins. Co.*, 77 F.R.D. 496, 497 (D. Alaska 1978) ("[q]uestions of state of mind and reasonableness are not usually determined upon summary judgment motions even when the underlying facts are not in dispute"). Accordingly, for purposes of summary judgment, the Court finds Defendant's do not meet their burden of demonstrating there is no genuine dispute of material fact as to whether Plaintiff's January 6, 2023, emails constitute a protected activity. Therefore, the Court will treat Plaintiff's January 6, 2023, emails as a protected disclosure for purposes of this Motion.

**2. Whether Plaintiff's January 6, 2023, Emails Were a Contributing Factor in Plaintiff's Termination**

CACI does not directly address whether Plaintiff can demonstrate retaliation was a contributing factor in its Motion. However, Plaintiff argues in his Opposition that he can demonstrate retaliation was a contributing factor through evidence "the decision maker had actual knowledge of [Plaintiff's] protected activity and immediate termination thereafter." Opp'n at 16. In support of this conclusion, Plaintiff mentions Butler's knowledge of his emails and "CACI's animus toward [Plaintiff], as evidenced by the prior biased investigation[.]" *Id*.

3:24-cv-00043-JAH-BLM

1    CACI addresses this point thoroughly in its Reply.  CACI argues Plaintiff "has failed

2  to establish that retaliation was a contributing factor in the termination decision,"

3  explaining:  (1) "CACI began conducting initial audit samplings of Soeten's work" before

4  his purported disclosures of illegal activity; (2) CACI's ten-case sampling audits in April

5  and November of 2022 were conducted "at the direction of its client, DCSA"; (3) the May

6  2022 proposed course of action included terminating Plaintiff "if improvements were not

7  shown"; and (4) "most of the individuals required to agree with the recommendation to

8  terminate agreed with and made the decision to terminate" before the January 6, 2023,

9  emails.  Reply at 9-10.

10    To satisfy a Section 1102.5 claim, employee-plaintiffs must show "retaliation for

11  [their] protected activities was a contributing factor in a contested employment action."

12  *Lawson*, 12 Cal.5th at 667.  "The causal link may be established by an inference derived

13  from circumstantial evidence, such as the employer's knowledge that the [employee]

14  engaged in protected activities and the proximity in time between the protected action and

15  allegedly retaliatory employment decision."  *Morgan v. Regents of Univ. of Cal.*, 88

16  Cal.App.4th 52, 69-70 (2000).  "Essential to a causal link is evidence that the employer

17  *was aware* that the plaintiff had engaged in the protected activity."  *Id*. at 70 (quoting *Cohen

18  v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)) (emphasis added).  While temporal

19  proximity can be considered, it is only one factor.  *See Pratt v. Rowland*, 65 F.3d 802, 808

20  (9th Cir. 1995).

21    Here, Plaintiff argues Butler and Parham considered his January 6, 2023, emails,

22  though Plaintiff makes no such argument as to any other individuals who may have been

23  involved in the decision to terminate Plaintiff.  *See* Opp'n at 9, 16.  However, Plaintiff

24  provides no evidence to demonstrate *any* decision-maker at CACI had knowledge of his

25  January 6, 2023, emails when they decided to terminate Plaintiff. [8]

26

27

28  [8]    In fact, Plaintiff fails to provide citations to evidence in support of his arguments
throughout his Memorandum of Points and Authorities in support of his Opposition.  It is

In Plaintiff's Response to Separate Statement of Material Facts, he states: "Mr. Butler and Ms. Parham read, considered, and investigated Mr. Soeten's claims in his emails during the intervening time period between January 3, 2023 and January 10, 2023." RSS at 31. In an attempt to provide evidentiary support for this statement, Plaintiff cites portions of Parham's deposition as well as one of the January 6, 2023, emails. *Id*. However, the January 6, 2023, emails were not sent to Parham. *See* Ex. I; *see also* Clemens Decl. ¶ 5, Ex. N, at 103:15-20. Additionally, Plaintiff offers no evidence to dispute that Parham and Butler discussed and agreed Plaintiff's termination was the best course of action on January 3, 2023, three days *before* Plaintiff's supposed disclosure. *See* Butler Decl. ¶ 5; Parham Decl. ¶ 13; Ex. H at 2. Furthermore, Plaintiff does not dispute Parham, McDaniel, and Schmidt all agreed Plaintiff's termination was the best course of action on December 23, 2022, weeks before the January 6, 2023, emails. *See* RSS at 23, 25.

Both Parties agree the decision to terminate Plaintiff's employment was approved by all necessary personnel, at the latest, by January 10, 2023. RSS at 31. Based on the evidence before the Court, Frank Abramcheck is the only *potential* decision-maker who could have agreed with the decision to terminate Plaintiff *after* January 3, 2023. This information comes from Butler's declaration, in which he explains that—following his discussing with Parham on January 3, 2023, during which they both agreed termination was the best course of action—the "next steps" were "discussing the termination decision with Frank Abramcheck, to ensure [Butler] provided him with situational awareness." Butler Decl. ¶ 5. Additionally, Parham references a "Frank" in her January 4, 2023, email, writing: "I briefed [the recommendation to terminate Plaintiff] to [Butler] yesterday and he will discuss with Frank and advise on the next steps." Ex. H at 2. The only other

---

not the role of district courts "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). Rather, district courts "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id*.

mention of Abramcheck in the record is in a letter from DCSA OIG to Abramcheck, addressing him as "Director" of CACI Premier Technology. Ex. 6 at 2. However, Plaintiff never mentions Frank Abramcheck in his briefing, much less argues he was aware of Plaintiff's January 6, 2023, emails when he presumably concurred with the decision to terminate Plaintiff. *See generally* Opp'n. Therefore, the Court need not consider Abramcheck's role, if he had one at all. *See Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016) (arguments not raised in opposition to a motion for summary judgment are waived).

Whereas CACI has provided undisputed evidence that all *known* decision-makers involved in Plaintiff's termination formed their respective opinions before January 6, 2023, Plaintiff has failed to provide evidence demonstrating any of the decision-makers responsible for Plaintiff's termination were aware of the January 6, 2023, emails *before* they agreed termination was the best course of action. Therefore, Plaintiff cannot, through evidence that would be admissible at trial, demonstrate retaliation was a contributing factor to his termination. *See Morgan*, 88 Cal.App.4th at 70 (it is "[e]ssential … the employer *was aware* that the plaintiff had engaged in the protected activity" to show retaliation was a contributing factor to the contested employment decision). Accordingly, Defendant's Motion as it pertains to Plaintiff's cause of action for whistleblower retaliation under Section 1102.5 is **GRANTED**, and this cause of action is **DISMISSED**.

### B. Plaintiff's Wrongful Termination Claim

CACI argues Plaintiff's cause of action for wrongful termination in violation of public policy fails for the same reasons as Plaintiff's whistleblower retaliation claim because the public policy on which Plaintiff's claim relies is protected by California Labor Code Section 1102.5. Mot. at 20. Plaintiff concedes "the second cause of action rises or falls with the first cause of action." Opp'n at 17.

To satisfy a claim for wrongful termination in violation of public policy, a plaintiff must prove his termination violated a public policy "that is (1) fundamental, (2) beneficial for the public, and (3) embodied in a statute or constitutional provision." *Turner*, 7 Cal.4th

at 1256.  When a plaintiff fails to establish the underlying retaliatory employment action, a claim for wrongful termination in violation of public policy cannot survive on its own. *See Noone v. Hitachi Rail STS USA, Inc.*, 2024 WL 5415115, at *7 (C.D. Cal. Dec. 2, 2024) (holding "[b]ecause Plaintiff does not adequately allege a claim under § 1102.5, the court finds Plaintiff does not adequately allege a derivative claim for wrongful termination in violation of public policy"); *Dauth v. Convenience Retailers, LLC,* 2013 WL 5340396, at *3 (N.D. Cal. Sept. 24, 2013) (same); *Lozano v. Neovia Logistics Distrib., LP*, 2021 WL 4313869, at *11 (C.D. Cal. Aug. 4, 2012) (same).

Here, because Plaintiff's whistleblower retaliation claim fails under California Labor Code Section 1102.5, Plaintiff's derivative claim for wrongful termination in violation of public policy also fails.  Accordingly, Defendant's Motion as it pertains to Plaintiff's cause of action for wrongful termination in violation of public policy is **GRANTED**, and this cause of action is **DISMISSED**.

## CONCLUSION

Accordingly, IT IS HEREBY ORDERED Defendant's Motion for Summary Judgment is **GRANTED**, and this action is **DISMISSED with prejudice**.

**IT IS SO ORDERED**.

DATED: June 24, 2025

JOHN A. HOUSTON
UNITED STATES DISTRICT JUDGE